1            **UNITED STATES DISTRICT COURT**

2              **DISTRICT OF IDAHO**

```
3

   UNITED STATES OF AMERICA,      )  CASE NO. 4:18-cr-00103-BLW
4                                 )
                 Plaintiff,       )  SENTENCING
5                                 )
              vs.                 )
6                                 )
   JOSEPH LAVERN HARRIS,          )
7                                 )
                 Defendant.       )
8  _____ )

9
```

10

11        **TRANSCRIPT OF PROCEEDINGS**
      **BEFORE THE HONORABLE B. LYNN WINMILL**

12      **TUESDAY, AUGUST 20, 2019; 2:37 P.M.**
         **POCATELLO, IDAHO**

```
13

14  FOR THE UNITED STATES OF AMERICA
          John C. Shirts
15        US ATTORNEY'S OFFICE
          801 E. Sherman, #192
16        Pocatello, ID 83201

17  FOR DEFENDANT
          Matthew L. Kinghorn
18        FEDERAL DEFENDER SERVICES OF IDAHO, INC.
          757 N. 7th Avenue
19        Pocatello, ID 83201

20

21
   Proceedings recorded by mechanical stenography, transcript
22 produced by computer.
   _____
23
```

24       **TAMARA I. HOHENLEITNER, CSR 619, CRR**
       FEDERAL OFFICIAL COURT REPORTER

25     550 WEST FORT STREET, BOISE, IDAHO  83724

I N D E X

AUGUST 20, 2019

Proceedings                                                      Page

        Recommendations by the Government................   4
        Recommendations by the Defense..................  12
        Statement by the Defendant......................  23
        Court's comments and Sentencing.................  23

```
 1                    P R O C E E D I N G S

 2                      August 20, 2019

 3              THE CLERK:  The court will now hear Criminal Case

 4    18-103, United States vs. Joseph Lavern Harris, for sentencing.

 5              THE COURT:  Good afternoon, Counsel.

 6         The defendant entered a plea of guilty to Count 1 of

 7    the indictment.  The court ordered a presentence investigation

 8    report, which has been provided to court and to counsel.

 9         Let me inquire:  Mr. Harris, have you had a chance to

10    review the presentence report?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  And, Mr. Kinghorn, you have gone over the

13    report with your client, I trust?

14              MR. KINGHORN:  I have, Your Honor.

15              THE COURT:  There were objections filed to the

16    presentence report.

17         Do either of you intend to call any witnesses?

18              MR. SHIRTS:  No, Your Honor.

19              MR. KINGHORN:  No, Your Honor.

20              THE COURT:  All right.  I assume, then, that there is

21    no factual dispute about what is reported in the presentence

22    report but only what legal consequences should flow from those

23    facts.

24         That being the case, I will just hear the arguments of

25    counsel.  I'll ask you to go ahead and roll into your argument,
```

1    both your position on the objections to the presentence report

2    and your ultimate recommendation.

3              Starting with the government, Mr. Shirts.

4              RECOMMENDATION BY THE GOVERNMENT

5              MR. SHIRTS:  Yes, Your Honor.  Thank you, Your Honor.

6              The base offense level here is not in dispute.  It is

7    a level 32.  There are specific offense characteristics that are

8    in dispute.  Those that aren't are a four-level enhancement for

9    the victim being under 12 years old, a two-level enhancement for

10   the child production involving a sexual act.

11             The first issue that is in dispute is a two-level

12   enhancement for whether the defendant acted as a parent or

13   guardian and whether that two-level enhancement should apply.

14             The government feels that two-level enhancement should

15   apply.  Section 2G2.1(b)(5) is, from Note 3(A), intended to be

16   applied broadly.  And the government feels that, in some cases,

17   that's an easier call than it is here.  But still, in this case,

18   there is substantial and enough evidence to support that

19   enhancement applying.

20             Looking towards *United States vs. Hernandez*, which is

21   a Ninth Circuit case, it is very similar to what we have before

22   this court; where, in that case, the victim was sometimes left

23   alone with the defendant when her aunt went to run errands.

24             Here, you have a defendant who lived in the same

25   residence with the victim for a period of about a month and was

1   at times and at least one occasion was definitely left alone

2   with the defendant when additional child pornography was

3   produced.  And to the point of where, obviously, this isn't

4   controlling but where the victim herself referred to the

5   defendant as "dad" or as some sort of father figure.

6          And to that point, we'd just show that she had enough

7   familiarity with the defendant in her home to be able to be

8   comfortable referring to him as such.

9          THE COURT:  How long had Mr. Harris been in the home

10  with the child?  My memory says three months, but I could be

11  wrong.  Did I overstate that?

12         MR. SHIRTS:  Your Honor, I think it was from January

13  2018 until the end of February for the same year.  So it was

14  approximately a month was my understanding.

15         THE COURT:  So about a month?

16         MR. SHIRTS:  A month, yes, Your Honor.

17         And even though the length of time can be considered,

18  but I think that's enough of a length of time to be -- to have

19  that enhancement here.  I think it goes to the fact of someone

20  having access to a child increases their ability to abuse a

21  child; and, therefore, someone living in the home should receive

22  an enhancement if they have that access.

23         The next -- the next enhancement that's at issue is

24  the adjustment for role of the offender under Section 3B1.1(c).

25  Two levels were added for the defendant being an organizer,

1    leader, manager, supervisor in criminal activity.

2         This was sought for the defendant's codefendant,

3    Ms. Evans.  The government did not ask for it in that case.  But

4    we are seeking it here, Your Honor, because we do feel that the

5    defendant did act in an organizer, leader, or manager role for a

6    couple reasons.  The first being from the evidence of the

7    ledger, the writings back and forth between these two.  It

8    appears, from that document, the defendant was the driving force

9    behind this abuse.  Although Ms. Evans obviously played a

10   significant role in that, he was the one who was seeking out not

11   just her or her mother for sexual activity but also for the

12   children and trying to plan that in a sort of way.

13        In addition, Ms. Evans has noted to at least law

14   enforcement that the defendant was the one who handed her the

15   phone on one of those occasions when the child pornography was

16   produced and that she took the photo after he handed her the

17   phone.

18        I think that goes to further his role in why he

19   is -- should receive that enhancement where Ms. Evans did not.

20        With that, Your Honor, if all those adjustments are

21   applied, the total offense level would be a 42, with a 3-point

22   reduction for acceptance of responsibility, with a 39 being the

23   total offense level.

24        The criminal history category of 3 yields a guideline

25   range of 324 months up to the statutory maximum in this case,

1        which is 360 months.

2            The government recommends a sentence 20 months lower

3        than probation's recommendation, recommending a sentence of 340

4        months followed by a lifetime of supervised release.

5            We do so for the following reasons.  And largely, my

6        argument is going to focus around the victim in this case and

7        that impact it's had on her and why the government feels that a

8        significant sentence of incarceration is needed to protect not

9        only individuals like her but for justice for her, Your Honor.

10           The social worker who has been a part of this case

11       since the victim was transferred into their custody has noted

12       that this -- the defendant's choices will impact the victim's

13       life forever.  She shared that once investigators went to the

14       home, they found drugs and needles left out; the defendant and

15       Ms. Evans having sex in front of the children while high; and

16       they left the children unsupervised, uncared for in filthy

17       conditions.

18           But as bad and awful as those conditions are and what

19       was going on with the methamphetamine use in that house, they

20       don't fully account for the abuse that happened at the hands of

21       the defendant to the victim and the victim's own mother.

22           As this court is well aware, the defendant not only

23       sexually abused the victim, but he captured it.  He captured it

24       and he produced child pornography.  And this was -- this was a

25       man who this young child who didn't have a father figure in her

1   life called "Dad."  I think that is one of the great tragedies

2   of this case, of a young, four-year-old child yearning for a

3   father figure, and this person who has been in the home not very

4   long but at least a month is someone she can see as a father

5   figure abusing her in such a way and capturing that abuse.

6       Because of that abuse, the victim has nightmares

7   almost every night.  She cannot sleep through the night and is

8   constantly fearful.  She has been in therapy for over a year in

9   an attempt to try to get her to be able to cope.  But it's

10  unknown how long she will be able to be in therapy or need

11  treatment.

12      And she regularly wets her pants when change happens

13  or when she has a memory of the defendant.  I think that's

14  significant because even a four-year-old child is going to have

15  significant memories and impact of that abuse, not only the

16  abuse itself but also the wide-ranging impacts of what the

17  defendant did to her in conjunction with losing any support

18  structure she even attempted to have.

19      The question has been raised through, I think, the

20  defendant's sentencing memo about the role his low IQ plays.

21      THE COURT:  I was going to ask.  Let me give you the

22  benefit of where my concerns lie in this case.

23      When you read what occurred here, there is a certain

24  amount of outrage that is just hard to even suppress.  But then

25  when you read the presentence report and you look at Mr. Harris'

1    background, you know, an IQ of 69, 70, 72, in that range, you

2    know, under Supreme Court precedent, a person with an IQ of 72

3    or below cannot receive the death penalty because it's perceived

4    to be cruel and unusual punishment.  So it does suggest that

5    that has to be a pretty substantial factor in assessing

6    culpability.

7         Then there is the fact that at least -- you know, it's

8    not been established, but there appears to be some suggestion

9    that Mr. Harris himself was sexually abused or at least

10   physically abused as a very young child, struggled on many

11   levels, mental health problems.  That calls into question moral

12   culpability at some level.

13        And so if we put that aside for a moment, though there

14   are two factors -- you have alluded to both of them.  One is

15   just justice for a child who is victimized.  The second is

16   protecting society from conduct of Mr. Harris in the future.

17        I don't think general deterrence is as much of an

18   issue, but I'm struck and concerned by whether Mr. Harris would

19   pose a danger to a child in the future even under a lifetime of

20   supervised release.

21        So this case, in my mind, that's where I -- I really

22   look at this case in terms of moral culpability.  When you look

23   at Mr. Harris' background, the problems he has were not the

24   result of choices; but genetics, environmental, whatever, has

25   left him in the position he is.

1        But that doesn't take away the court's ultimate

2   obligation to protect society and to impose a just sentence,

3   which, to some extent, really does bear upon just an issue of

4   justice for the victim.

5        So I just want to let you know.  And I'm saying that

6   for Mr. Kinghorn as well as for you, so you know where I'm at in

7   this case.  You can either say:  Judge, you are missing the

8   forest for the trees; or this is why those two concerns really

9   dictate, you know, a 340-month sentence.

10       You know, I looked at this -- of course, I looked at

11  it once before in sentencing the codefendant.  And you just

12  leave yourself with this just appalling feeling of inadequacy of

13  trying to come up with what is an appropriate sentence under

14  these facts.

15       I could justify a fixed life sentence in this case,

16  but I could also justify a 15-year sentence only at the

17  mandatory minimum.  Anywhere between that range is a real

18  challenge.

19       So I just wanted to let you know what I was thinking,

20  because you were kind of alluding to the one issue that if it

21  were not for the mental health issues and the capacity --

22  limited capacity issues, I don't think there is any question but

23  that we would be looking at a 30-year prison sentence.

24       But what makes me have to ask myself about whether

25  that is just, is just those very factors that you go into.  So I

1    just -- I try to be fairly transparent about my thinking before

2    counsel sits down so you can address those concerns.

3              MR. SHIRTS:  Yes, Your Honor.  And I appreciate it.

4              And I think it is difficult, because you have someone

5    with a very low IQ and someone who, in a wide range of events,

6    could be considered less culpable.  If this crime was less

7    serious, was of a less serious nature, something of, you know, a

8    smaller amount of methamphetamine production and distribution or

9    something of that nature, I think it would be easier to justify

10   a lower sentence.

11             From the government's standpoint, the factor of what

12   has transpired with the child -- and I guess the part that

13   really gets me, Your Honor, is the writings and the ledgers back

14   and forth.  And it shows that he understood and knew the

15   wrongness of what was going on and still tried to persist to

16   complete that.

17             And the concern the government has is:  Is that

18   ability for him ever going to be able to stop?

19             I think, on some level, it cuts both ways.  It reduces

20   culpability, but then, also, if he is released before he should

21   be, that ability to reoffend against another child could

22   potentially take place with somebody who -- he doesn't have the

23   IQ that is, you know, somebody that's developmentally delayed.

24   And that's what causes the government some concern.

25             And we are requesting a sentence lower than what

1    probation is recommending because we take into account that he

2    has come in and pled guilty, and that is the first step towards

3    rehabilitation.  And we feel comfortable requesting a lower

4    sentence than 360 months and extending some benefit to that.

5              But I still think the egregiousness of this crime and

6    the age of the victim and some things that aren't captured by

7    the guideline sentence, even given the defendant's IQ and his

8    developmental delay and ability, still justify a sentence of 340

9    months, Your Honor.

10              And I'll stand for questions.

11              THE COURT:  No.  I appreciate your argument.  Thank

12    you, Mr. Shirts.

13              MR. SHIRTS:  Thank you.

14              THE COURT:  Mr. Kinghorn.

15                  RECOMMENDATION BY THE DEFENSE

16              MR. KINGHORN:  With regard to the custody and care

17    enhancement, Your Honor, when we were initially talking about

18    resolving this case with Ms. Wick -- Mr. Shirts inherited this

19    case -- there was some lengthy discussion with regard to that

20    particular enhancement.  No agreement was made in terms of a

21    plea agreement, Your Honor.  But I know that that's something

22    that weighed on the government's mind, as well, before

23    Mr. Shirts inherited the case.

24              The court must look at the actual relationship that

25    existed between the defendant and the minor.  That's what the

1    guideline says.  In this particular case, we have a few things

2    that stand out.  One, the minor called Joe "Dad," and that's

3    according to a police report, a CPS report.

4         THE COURT:  Mr. Kinghorn, on that issue, I looked back

5    at the presentence report very quickly, and it suggests that

6    Mr. Harris was living in the home starting in December, and this

7    incident came to light in late February.  So it suggests it was

8    more like two months, two and a half months.  Do you dispute

9    that?

10        Again, it's not determinative, but it does seem to me

11   someone who lives in the home for six months is different from

12   someone who lives in the home for six days.  So it at least has

13   some bearing on --

14        MR. KINGHORN:  I think that's an important factor for

15   the court to consider.

16        What we have in the presentence report, Your Honor, is

17   some things that shed light on that.  If the court will refer to

18   the presentence report, I believe -- I believe it discusses the

19   length of time that he was there.  There was no objection to

20   that by myself nor the government.  And I'm having a hard time

21   finding it, but it does say she began dating Mr. Harris in

22   January of 2018.

23        THE COURT:  Well, I guess I would like to clear that

24   up.  Because I'm looking at paragraph 39.  It says the offense

25   occurred sometime in December 2017 through February 26, 2018.

1          And then I think paragraph 93 says that the defendant

2    was involved in a romantic relationship with the codefendant,

3    Ms. Evans, from approximately December 2017 through March of

4    2018.

5          So I'm just -- that's why I asked the question,

6    because I was not crystal clear.

7          Ms. Thompson-Kelley, do you have anything you want to

8    add on that?

9          THE PROBATION OFFICER:  Your Honor, they did begin

10   dating in approximately December, and they started to cohabitate

11   in January.  They were evicted from that residence and moved in

12   with Ms. Evans' mother in February of that year.

13         So it went over the months of January and February,

14   and they started dating in December.

15         THE COURT:  Okay.  So were they living with Ms. Evans'

16   mother when this happened?  I thought they were in their own --

17         THE PROBATION OFFICER:  They -- no.  When this

18   happened, they lived in Ms. Evans' mother's trailer house.  And

19   she was there sometimes, sometimes not.

20         THE COURT:  Okay.

21         THE PROBATION OFFICER:  And that was in February.  So

22   they began cohabitating in January, were evicted, and moved into

23   the secondary residence in February.

24         THE COURT:  All right.  And then this incident was

25   reported sometime in --

1          THE PROBATION OFFICER:  In February.

2          THE COURT:  Mid to late February; correct?

3          THE PROBATION OFFICER:  Yes, on February 28.

4          THE COURT:  All right.

5          THE PROBATION OFFICER:  Sorry.  Prior to that.  They

6     moved out of the home on February 28.

7          THE COURT:  February 17 is the --

8          THE PROBATION OFFICER:  Was the call, yes.  They moved

9     into the home on February 15.  Law enforcement was called a

10    couple of days later, and they moved out on February 28.

11         THE COURT:  All right.

12         MR. KINGHORN:  And that lines up with my understanding

13    of the relationship, Your Honor.

14         THE COURT:  So it's somewhere between a month, month

15    and a half, two months.

16         MR. KINGHORN:  But they were not cohabitating in

17    December of 2017.  They began cohabitating in January of 2018.

18    So, roughly, he was around the victim in this case for a month's

19    time, Your Honor.

20         The issue about the minor calling Joe "Dad," again,

21    that's according to a police report.  She was four at the time.

22    I'm not sure what that tells us.  I would note, for the court's

23    awareness, that her biological father is also named Joe; and I

24    don't know how that plays into it.

25         Joe was certainly dating her at this time.  According

1          to my client, she called anyone who is older "Joe."  Ms. Evans

2          had several relationships that are not noted in the PSR.  So I

3          don't know how many adult men were in this child's life; Joe was

4          one of them.  And on that one occasion, she said "dad."

5                   He was dating the mother.  They were cohabitating for

6          approximately one month.  In the interview that Ms. Evans gave

7          to law enforcement, she said she never left Joe alone with the

8          child.  She said she would not have entrusted him with the

9          victim.

10                  He was likely alone with her on one occasion, one

11         undetermined time.  But from what the codefendant says, she

12         would have not supported that kind of action or even allowed it.

13                  THE COURT:  Well, that -- I've got to say:  That's a

14         little hard to swallow given what she -- her participation in an

15         act of fellatio between the defendant and the victim.  I mean,

16         I -- her statement that she would not have left him alone, I'm

17         not sure that means a whole lot to me given her conduct.

18                  So I understand that is exactly what she said, but I

19         just need to say:  I'm not ready to take her statements to the

20         bank.

21                  MR. KINGHORN:  Well, the problem is, Your Honor, we

22         don't have a lot to substantiate the relationship between my

23         client and the victim in this case.  What we have are a couple

24         of statements from her and cohabitation for roughly a month's

25         time.

1          So I just don't think there is enough there,

2    Your Honor, to support this enhancement.

3          Does the court have other questions for me?

4          THE COURT:  No.  I've got a lot of questions but,

5    unfortunately, none that you or Mr. Shirts can answer or that I

6    can answer.  But go ahead.

7          MR. KINGHORN:  The role in the offense.  Did the

8    defendant exercise control over the codefendant, Ms. Evans, in

9    this case?

10          In my opinion, Your Honor, and based on everything

11   that we have seen in the two reports -- rather, three -- that we

12   had done with regard to Joe's competency in this case, she was

13   Joe's intellectual and cognitive superior.

14          She said they were using drugs at the time this

15   occurred.  There was a four- or five-day or a three- or four-day

16   binge where they were using drugs when these photos were -- this

17   photo was taken.

18          My client also said to the police that they were using

19   drugs at the time.  Ms. Evans said the drugs may have been laced

20   with something.  In the fog of a days-long drug-fueled binge,

21   can a leader really emerge, Your Honor?  I think that's

22   something the court has to consider in this case.

23          On top of that, when you look at the fact that Joe

24   suffers from mental health problems and from significant

25   cognitive limitations, I don't think that we have a leadership

1     enhancement here.

2           Both experts in this case, Dr. Traughber and the BOP

3     psychiatrist, they placed Joe's full-scale IQ in 2018 and early

4     2019 at 66 and 67, respectively.

5           Dr. Traughber noted that Joe was far more likely to be

6     a follower than a leader.  In fact, he said it's fairly unlikely

7     that Joe could coordinate and lead a complex plan.

8           Having gotten to know Joe as well as I have over the

9     last 17 months, I would wholeheartedly agree with that.  And to

10    be frank, Your Honor, I don't know that Joe could organize a

11    barbecue; but here he is getting an enhancement for being a

12    leader in an organization where there was one photo produced.

13          The photo itself I don't think supports this

14    enhancement, either.  Joe is in the picture, not taking the

15    picture.  If this were a stage, Your Honor, he wouldn't have

16    been a producer or a director; he would have been an actor.

17          And there was also a statement, a very graphic

18    statement, in the presentence report on page 6, paragraph 11,

19    where there is this text message that's sent to Ms. Evans'

20    mother about a planned sexual encounter with the codefendant's

21    mother.  And it essentially outlines what Ms. Evans is

22    requesting her mother and Joe do together.

23          Now, she says that she sent that text message and then

24    later says, no, it was Joe that sent it.  But initially, she

25    said it was her.  Again, Your Honor, I think the planning that's

1    being shown here is being done by her and not Joe.

2         She notes that she was a participate -- she was a

3    participant in the graphic -- incredibly graphic notes about

4    sexual encounters that they would like to be engaged in that she

5    was -- she was making notes right alongside him, was responding

6    to what he was saying.  She was -- he was responding to what she

7    was saying as well.  These contain fantasies, and they contain

8    both their handwritings.

9         There is a statement in the presentence report on page

10   8, paragraph 21 that says -- now, this is from Ms. Evans' own

11   statement:

12        On approximately February 22, 2019, Elizabeth Dawn

13   Evans participated in another interview.  She advised that she

14   and Joe Harris started living together at the end of January

15   2018.  They moved in together with her mother around

16   February 15, 2018.

17        She told law enforcement on February 25 she was in the

18   bathroom of the residence with Joe Harris when her daughter

19   entered.  Joe put his penis in the victim's mouth.  Elizabeth

20   used their shared camera to take a picture of the oral rape

21   before she told CV1 to leave the room.  She advised that she

22   then told Joe to delete the picture.

23        Nowhere in this paragraph does it say that he was

24   forcing her or telling her or advising her on what to do.

25        So I think all of these things, Your Honor -- all

1    these things show that this enhancement is not supported in this

2    case, and we would ask the court to remove it from the

3    presentence report as well.

4          Does the court have any questions with regard to that

5    one?

6          THE COURT:  No.  Thank you.

7          MR. KINGHORN:  Your Honor, I don't have a ton of

8    argument in this case.  I feel like I'm better in writing, and I

9    have supplied the court with a lot to read.

10          The court has already made note of the fact that we

11    have someone here who had an incredibly unstable childhood, who

12    suffered abuse.  I actually noted in my sentencing memorandum

13    how many times Joe was moved.

14          And this -- this, I think, is reflective of the kind

15    of childhood that no child should have, being moved around

16    sometimes every -- within a year, a year's time multiple places;

17    and then, you know, being moved from school to school and

18    eventually being put in a boys' home.  And all of these things

19    kind of add up, Your Honor, when we have someone who is already

20    suffering from cognitive deficiencies.

21          And I think it took a toll on him.  He certainly made

22    some bad decisions with regard to using controlled substances.

23    But we often see that in people who have suffered abuse and who

24    have unstable home environments.

25          Then we have, Your Honor, the piece with regard to his

mental health issues and with regard to his cognitive
deficiencies.  What is the right sentence to impose when we have
someone with a 66 or 67 IQ?  I don't know, Your Honor.

I have suggested the mandatory minimum in this case is
the right sentence to be imposed for a couple of reasons.
Number one, if the court sustains my objections, then his
sentencing range under the guidelines would be 210 months to --

THE COURT:  262?

MR. KINGHORN:  -- 260.  Thank you.  262.

THE COURT:  I'm not sure of that.

MR. KINGHORN:  210 months, Your Honor, is seventeen
and a half years.  The reason I asked for 15 years in this case
is, again, for two reasons:  Number one, that's what the
codefendant got in this case; number two, a two-and-a-half-year
reduction would essentially take into consideration as a
variance the fact that we're dealing with someone with severe
cognitive deficiencies as well as mental health problems.

So, Your Honor, we are asking for a sentence at the
mandatory minimum in this case.  We think it's the right
sentence.  It is a significant sentence.  It will take him off
the streets for a very long time.

But, as Dr. Traughber has said, the kind of treatment
that he will need in terms of his cognitive deficiencies, his
personality disorder, and eventually for sex offender purposes,
is going to be better suited in an outpatient setting in the

1    community, where we can have someone really focusing on him in

2    an individual way.

3              And I think, Your Honor, the right sentence in this

4    case, the sentence we're asking for, is 15 years.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. KINGHORN:  Your Honor, before I sit down, I'll say

8    it now:  There is one request that we are making, and I don't

9    know what kind of power or authority the court has to do this,

10   but I talked to the marshals about this.

11             He understands he is going away for a significant

12   period of time.  His grandmother is here in support of him

13   today.  And one thing he has requested is that he be able to hug

14   her before he exits the courtroom and is taken to a different

15   state for placement at BOP.  I'll just let the court consider

16   that.

17             THE COURT:  Well, before I hear -- Brandon or Frank,

18   what --

19             THE MARSHAL:  Your Honor, it's not our general

20   practice or within our policy to allow that.  However, if the

21   court deems it, then we will follow the court's ruling on that.

22             THE COURT:  Thank you.  I don't know what I'll do, but

23   I'll think about it for the next few minutes.  I generally don't

24   ask the Marshals Service to not follow their policy.

25             MR. KINGHORN:  I'll just let the court know that I

1     have never asked that of the court.  In this case, I --

2               THE COURT:  I know.  I know.

3               MR. KINGHORN:  -- I'm following my client's request.

4               THE COURT:  Okay.

5               Mr. Harris.

6               THE DEFENDANT:  Yes, Your Honor.

7               THE COURT:  Excuse me.  Anything you want to say in

8     your own behalf?

9                    STATEMENT BY THE DEFENDANT

10              THE DEFENDANT:  Other than I'm sorry for my actions

11    and for being into the drugs.  That's basically all I want to

12    say.  I'm sorry for doing what I done and getting into the drug

13    situation.

14              THE COURT:  Okay.  All right.  Thank you, Mr. Harris.

15              Mr. Shirts, you may have already done so, but would

16    you move for the third level for acceptance of responsibility?

17              MR. SHIRTS:  Yes, Your Honor.

18              THE COURT:  I'll grant that motion.

19                   COURT'S COMMENTS AND SENTENCING

20              THE COURT:  Let me address the objections.  The first

21    objection has already been resolved by the probation office

22    filing a supplemental or second addendum.  Originally, the

23    probation office had suggested a four-level enhancement for

24    images portraying sadistic or masochistic conduct with an infant

25    or toddler.

1    With Ms. Evans, the codefendant in this case, I

2    concluded that simply didn't apply, and so that was removed from

3    the presentence report, so I don't need to address it.

4    I will just simply note that my conclusion in that

5    case was that the kind of psychological injury that was

6    suggested could support a finding of sadistic or masochistic

7    behavior.

8    It would become the exception -- well, it should be

9    the exception rather than the rule.  And I think to allow that

10   enhancement to apply here, it would probably apply in almost

11   every case on a charge of this sort.  And I think the idea of an

12   enhancement is just that; that it's something that makes this

13   case more culpable than the garden-variety case of this sort.

14   So, for that reason, I concluded in Ms. Evans 's

15   sentencing and I conclude here, as well, that imposing that

16   enhancement in this case would -- even if it is technically

17   possible to make the argument that the conduct that results in

18   this kind of psychological injury to the child can be viewed as

19   sadistic or masochistic would just simply allow the exception to

20   swallow the rule.

21   That is not to say that there might not be a case

22   where there was particularly egregious psychological torture,

23   for example, of a child as part of creating or viewing child

24   pornography that it may possibly apply.  But I just think under

25   the facts of this case, I can't make that finding.

1    With regard to the objection about whether Mr. Harris

2    was acting as a parent or a guardian to CV1, the victim in this

3    case, I will tell you that my initial reaction was that -- well,

4    actually, my initial reaction was that this is appropriate.

5    And the reason is that, first, Mr. Shirts argued the

6    guidelines suggest it should be looked at broadly.  And it

7    clearly has been applied to situations involving other than just

8    parents and legal guardians.  It has been applied to teachers,

9    daycare providers, babysitters, and other temporary caretakers.

10   And it seems to me that, clearly, an individual who is

11   cohabiting with a victim's mother for a period of, what, five to

12   eight weeks and who the child has on at least one occasion

13   called "Dad" is -- well, is, in fact, a person that has enough

14   of a trust and supervision relationship with a young child as to

15   justify the imposition of the enhancement.

16   So, for that reason, I'm going to overrule the

17   objection.  It does strike me that, clearly, the relationship

18   here is at least tantamount or equivalent to that of a teacher,

19   daycare provider, or babysitter.  So, for that reason, the court

20   will find that the defendants, in fact -- or the victim, rather,

21   was -- the defendant was in a relationship with the child that

22   would justify the enhancement.

23   With regard to the objection to paragraph 45 and the

24   two-level enhancement under Section 3B1.1(c), I was initially

25   very concerned by this enhancement.  And my initial thoughts as

1        I prepared notes was that I intended to sustain the enhancement.

2            But I did some further research on the issue and found

3    cases where the enhancement -- and there were two concerns I

4    should point out.

5            One is the defendant's limited mental capacity

6    somewhat undermines the idea that he could organize a

7    relationship or organize a joint activity that would justify the

8    enhancement.

9            And then, secondly, the evidence here was not a

10   complex relationship in which the codefendant, Ms. Evans, was

11   somehow persuaded to groom and arrange for children to be

12   brought to the defendant.  Rather, it appeared to be more of a

13   limited situation in which at least there is the suggestion that

14   the defendant directed the codefendant to participate with him

15   in this conduct by taking photographs of it.

16           And while I think it was a very close call -- and I

17   will tell you I'm going to impose the enhancement essentially in

18   name only -- I'm going to overrule the objection.  Because there

19   is case law, for example, applying the enhancement to someone

20   with an IQ of under 60.  Because the enhancement applies not to

21   the mental capability of the defendant but, rather, the ability

22   to control and supervise.

23           And obviously, from other communications, it appears

24   that Mr. Harris was, in fact, directing or influencing Ms. Evans

25   in some of her other behavior, as well: sitting down and writing

1   lists of deviant sexual acts and partners.  All of that, I

2   think, supports the idea that, in fact, Mr. Harris had the

3   ability to direct Ms. Evans.  Whether it was because of the

4   male-female relationship or whether Ms. Evans was particularly

5   needy of male control or direction, I don't know, but it seems

6   to me that that's justified from the record.

7          I would note, I think it was *United States vs.*

8   *Ramos* -- or, actually, *United States vs. Plunk* from the Sixth

9   Circuit in which they applied the enhancement to an individual

10  with an IQ of 52 because he was, in fact, directing the

11  activities of a codefendant.

12         And there have been other cases, *United States vs.*

13  *Ramos* from the Fifth Circuit, reaching the same conclusion.

14         And then from the Ninth Circuit decision, *U.S. vs.*

15  *Whitney*, the Ninth Circuit says that the sentencing guidelines

16  allow for a two-level role enhancement if the defendant is an

17  organizer, leader, manager, or supervisor; and the court may

18  impose the enhancement if there is evidence that the defendant

19  exercised some control over others involved in the commission of

20  the offense or was responsible for organizing others for the

21  purpose of carrying out the crime.

22         Under these circumstances, I think that there is

23  evidence to support that conclusion that Mr. Harris was playing

24  that role.  But on the other hand, I think, given the

25  defendant's very limited mental capacity, although I'm going to

1  overrule the objection, the court does intend, by way of freedom

2  of a variance, to consider that as a mitigating factor in

3  imposing sentence.

4      So for that reason, the court will overrule the

5  objections to the presentence report, adopt the presentence

6  report as my own findings in this matter, will adopt the

7  criminal history category of 3, the offense level of 39, and the

8  guideline range of 324 to 360 months.

9      The court is, finally, required to consider each of

10 the 3553(a) sentencing factors in determining what is a

11 reasonable and just sentence.  The first factor the court is to

12 consider is the nature and circumstances of the offense.

13     I think the details of what occurred here has been

14 detailed sufficiently in the presentence report, which I have

15 had to review repeatedly in this case and the case of the

16 codefendant.

17     I hope it is sufficient that I can simply indicate I

18 have reviewed it in detail on multiple occasions, and I don't

19 think I should need to state again here in open court as to what

20 that conduct was, except to indicate that it involved the

21 defendant engaging in fellatio with a very young child, at which

22 time the child's mother took pictures of that act, in essence,

23 taking pictures of what has been described as the oral rape of a

24 very young child.

25     The defendant had, on past occasions, indicated a

 1     desire to have sex with the minor daughter, and this was

 2     actually discussed by the defendant and the codefendant.

 3           The second piece of the puzzle the court is to

 4     consider is the history and characteristics of the defendant.

 5     And that's where the court finds some issues in mitigation that

 6     are just very substantial and very compelling.

 7           Mr. Harris is 32 years old, divorced, with two

 8     dependent children not in his care.  The State of Idaho

 9     terminated his rights regarding three additional children due to

10     neglect and, frankly, his utter inability to provide the

11     necessary care and treatment for his minor children.

12           He was primarily raised by his maternal grandparents.

13     There are allegations that he was sexually abused by his father

14     at a very young age; but he has no memory of that, and no

15     criminal charges were filed.

16           He indicated that he wanted to be released to his

17     father's home following his sentence of incarceration, but it

18     appears that that is not an appropriate place, and it also would

19     be a very dysfunctional place for the defendant to reside.

20           He has been placed in mental health facilities on

21     numerous occasions -- or repeated occasions, I should say.  He

22     has received not only the mental health residential placements

23     but ongoing outpatient treatment services through his youth and

24     adult life.

25           He has had multiple mental health assessments.  A

concern about his competency to stand trial was raised, and he
was transferred to the Bureau of Prisons for an evaluation,
which raised some questions about his ability to proceed with
trial.  But, ultimately, a decision was made that he was
competent to proceed in this case.

His diagnoses include the intellectual disability; the
fact that his IQ ranges somewhere between 67 to 71 or 72 range,
more recently, it's likely that it's in the high 60s; that he
has substance abuse disorders, specified personality disorders
with borderline features.

A psychosexual evaluation was not completed in
relation to this offense, as a suggestion was made in the
presentence report that such an evaluation may not be of as much
help as it might be with someone with better functioning than
the defendant.

He has abused a number of different drugs, including
marijuana, alcohol, methamphetamine, and opioids.  He has
participated in treatment services for those.

He attended school, but it was primarily special
education programs and did not obtain a high school diploma or
GED.

He has been subject to disability benefits most of his
life because of his limited cognitive function.  He has no
assets, no ability to pay a fine.

He has a fairly substantial juvenile record and a

1    criminal history category justifying -- or a criminal history

2    category of 3.

3            Finally, the court is to consider and impose a

4    sentence sufficient but not greater than necessary to achieve

5    the objectives set forth in 18 U.S. Code Section 3553(a)(2); and

6    that is: reflecting the seriousness of the offense, promoting

7    respect for the law, providing just punishment, adequate

8    deterrence, protection of the public, and any needed training,

9    care, or correctional treatment.

10           In my mind, there are really only two factors that I

11   think drive the sentence in this case.  The first and maybe not

12   as important is simply providing justice to the victim in this

13   matter; but the second and the overriding concern is the need to

14   protect the public.

15           Given the defendant's conduct and his -- not just in

16   this instance but the events leading up to the facts giving rise

17   to this charge, I have a grave concern about whether the public

18   would be safe from his conduct even if he is under active

19   supervision by a probation officer.

20           Were it not for that concern, I think the only just

21   sentence here would be 15 years, the mandatory minimum.  Because

22   I think in terms of moral culpability, how do you find moral

23   culpability with an individual who suffers from the cognitive

24   limitations and the mental health problems that the defendant

25   has?

He didn't choose any of those.  While his only choice involved perhaps substance abuse, all the other factors that led to his mental status that I think gave rise to this crime were all factors beyond his control.  And even the substance abuse was probably -- in fact, I think he said that he just wanted to feel normal, or something to that effect, in the presentence report.  So I think it's fairly clear that he is also self-medicating as he abuses opioids and methamphetamine.

So what I'm left with is trying to settle upon a sentence that will protect the public, and I don't know what that sentence is.  I suppose you can make an argument that it should be as long as the court can impose, but I think that takes out of the equation the reality that most people start to age out of some of their criminal behavior.  Mr. Harris is 32 years old, and I think that is something the court needs to consider.

I don't -- I would defy any human being coming up with a sentence that anyone can necessarily feel good about in this case.  There is just a lot of bad choices, none of which, to me, clearly represents a just sentence, but it's the best sentence that I can come up with given the circumstances presented by this case.

Mr. Harris, if you'll stand, I'll pronounce sentence.

The defendant, Joseph Lavern Harris, having pled guilty to Count 1 of the indictment, and the court

1     being satisfied that you are guilty as charged, I hereby order

2     and adjudge as follows:

3           Pursuant to the Sentencing Reform Act of 1984, it is

4     the judgment of the court that you be committed to the custody

5     of the Bureau of Prisons for a term of 300 months.

6           It is further ordered that you pay to the

7     United States a special assessment of $5,100, which will be due

8     immediately.  The court finds you do not have the ability to pay

9     a fine; accordingly, the fine will be waived in this matter.

10          The matter of restitution remains outstanding.  My

11    understanding is that we'll address restitution in a separate

12    proceeding.  I kind of got lost in the shuffle on that.

13         MR. SHIRTS:  No, Your Honor.  There hasn't been

14    a -- we have sought a restitution request.  There has not been a

15    restitution request in this --

16         THE COURT:  All right.  So you're not making any

17    restitution request at this time, nor will you in the future?

18         MR. SHIRTS:  Correct, Your Honor.

19         THE COURT:  All right.  Then there will be no

20    restitution order.

21         After considering Mr. Harris' limited financial

22    resources, I will order payment under the following schedule

23    unless modified by the court:

24         While in custody, you will submit nominal payments of

25    not less than $25 per quarter pursuant to the Bureau of Prisons

```
 1          Inmate Financial Responsibility Program.  And during the term of
 2     supervised release, you will submit nominal monthly payments of
 3     10 percent of your gross income but not less than $25 per month.
 4              Supervised release will be imposed for a period of
 5     life to commence upon your release from imprisonment.  During
 6     the term of supervised release, you will comply with all of the
 7     mandatory, standard, and special terms of supervised release as
 8     is set forth in the sentencing recommendation filed by the
 9     probation office as Docket No. 82 in the court's record.
10              Mr. Kinghorn, did you have a chance to go over those
11     conditions with Mr. Harris?
12              MR. KINGHORN:  Yes, Your Honor.
13              THE COURT:  Any objection to any of those conditions?
14              MR. KINGHORN:  No.
15              THE COURT:  Mr. Harris, do you have any questions
16     about those conditions?
17              THE DEFENDANT:  No, Your Honor.
18              THE COURT:  You understand that if you violate those
19     conditions, you will be brought back before the court, and a
20     further sentence of incarceration will be imposed?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  Mr. Harris, a defendant has the right to
23     appeal their conviction or sentence.  However, you did sign a
24     plea agreement which waived those rights with just a few
25     exceptions.
```

1     MR. KINGHORN:  Your Honor, in this case, he did not.

2     THE COURT:  Oh, I'm sorry.  I stand corrected.  There

3 was no waiver.  So let me back up.

4     Let me just advise you that you have the right to

5 appeal your conviction or sentence.  To do so, you must file a

6 notice of appeal within 14 days after judgment is entered in

7 your case.  If unable to pay the cost of an appeal, you may

8 apply for leave to appeal in forma pauperis.  If you so request

9 and qualify, the clerk of the court will arrange for legal

10 representation and will prepare and file a notice of appeal on

11 your behalf.

12     Now, I want to make sure I got this right.  Was a

13 preliminary order of forfeiture filed?

14     MR. SHIRTS:  Yes, Your Honor.

15     THE CLERK:  Yes, Your Honor.

16     THE COURT:  All right.  Accordingly, the property

17 identified in the plea agreement and preliminary order of

18 forfeiture will now be deemed forfeited, and a final order of

19 forfeiture will now issue.

20     I will recommend to the Bureau of Prisons that the

21 defendant receive credit for all time in federal custody.

22 Normally, in a case like this, I would recommend placement at a

23 facility appropriate for the housing of sex offenders to prevent

24 abuse by other inmates, but I don't know if you've looked at

25 that.

1          MR. KINGHORN:  We have, Your Honor.  We were going to

2     make the recommendation for Englewood, Colorado.  I suppose it's

3     going to be up to the Bureau of Prisons about whether or not

4     they think he should be placed in a medical facility.  I don't

5     know that he would be, but -- we are suggesting Englewood.

6          THE COURT:  I'm sorry?

7          MR. KINGHORN:  We are suggesting Englewood, Colorado.

8          THE COURT:  All right.  I will recommend Englewood,

9     Colorado.  But I don't think that is one of the facilities,

10    though, that's --

11         MR. KINGHORN:  My research suggests it is, but I could

12    be wrong.

13         THE COURT:  Okay.  Well, it's not -- okay.  I will

14    trust your research since I have not actually looked at it.

15    I've just gone on what I had understood from other cases.

16         All right.  I'll recommend Englewood, Colorado.  It's

17    certainly closer to southeastern Idaho than any of the other

18    facilities.  I think Buttner in North Carolina and Springfield

19    in Missouri, there are some other facilities like that.  If

20    Englewood has conditions that would allow that...

21         All right.  Let me turn -- I have thought about it

22    some more, Mr. Harris.  I can't allow a contact visit.  I just

23    don't do that.  I'm not sure I have ever done it.

24         The Marshals Service has a tough job.  And they have

25    protocols and procedures for a reason.  And I have to really

1    fall back on those.  I'm 99.9 percent confident that your

2    grandmother poses no risk, but I think I just can't allow the

3    Marshals Service or undermine what they are trying to do.

4         I would encourage them, of course, to the extent

5    possible, to allow visitation where you are now being housed

6    prior to transport.  I'm confident that won't allow a contact

7    visit but at least some arrangement where you can visit with

8    your grandmother before you are transported to begin serving

9    your sentence.

10         But, again, I can't ask the Marshals Service to do

11    what their protocol and standards say they should not do.

12         THE DEFENDANT:  What does that mean by having a visit?

13         (Pause.)

14         MR. KINGHORN:  Your Honor, he is right now being

15    housed in Bannock Jail; they don't do any sort of visitation.

16         THE COURT:  There's no visitation at all?

17         MR. KINGHORN:  Well, by video, Your Honor.  It's by

18    video.

19         THE COURT:  All I can do is ask the Marshals Service

20    to do what they can to accommodate as much contact with the

21    grandmother as is consistent with their policies and that of the

22    Bannock County Jail.

23         Brandon, were you going to say something?

24         THE MARSHAL:  I was just going to say that my

25    understanding is consistent with those findings that they only

1    allow video con- -- visitation with family.

2             THE COURT:  Okay.  All right.

3             All right.  I just can't do anything more than that,

4    Mr. Harris.  I do wish you the best of luck in coping with this.

5             This is clearly one of the five or six hardest

6    sentencings I think I have ever had, because there is just no

7    clear answer in your case.

8             And this being removed from -- I think you're -- well,

9    from the one person that you have that could provide you with

10   some moral support and not allowing that contact is troubling,

11   but I just can't bend the rules.  I just have to follow what the

12   Marshals Service says.  And I don't want to put them in that

13   position.  But I do wish you the best of luck.

14            Did I overlook anything?

15            THE CLERK:  Were you making any recommendation for the

16   RDAP program?

17            THE COURT:  I don't see that it would hurt.  I assume

18   that would -- certainly, if the defendant -- yeah.  There is

19   really no reason not to, so I will recommend the RDAP program as

20   well.

21            Mr. Foster or Ms. Thompson-Kelley, did I overlook

22   anything?

23            LAW CLERK:  No, Your Honor.

24            THE PROBATION OFFICER:  No, Your Honor.

25            THE COURT:  Anything else, Counsel?

1          MR. SHIRTS:  No, Your Honor.

2          THE COURT:  Anything else?

3          MR. KINGHORN:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  We'll be in recess.

5      (Proceedings concluded at 3:32 p.m.)

1                         REPORTER'S CERTIFICATE

2

3

4

5          I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

6     the foregoing is a correct transcript of proceedings in the

7     above-entitled matter.

8

9

10

11

12

13

14

15     /s/  Tamara I. Hohenleitner            09/25/2019
       _____       _____
16     TAMARA I. HOHENLEITNER, CSR, RPR, CRR   Date

17

18

19

20

21

22

23

24

25